320 F.2d 564
UNITED STATES of Americav.An Article of Drug Consisting of 47 BOTTLES, MORE OR LESS, Each Containing 30 Capsules of an Article Labeled in Part "* * * JENASOL RJ FORMULA `60' * * *"Marvin Schere, Doing Business as the Jenasol Company, Appellant.
No. 14035.
United States Court of Appeals Third Circuit.
Argued March 5, 1963.
Decided July 16, 1963.

Milton A. Bass, New York City (Bass & Friend, New York City, on the brief), for appellant.
Vincent J. Commisa, Asst. U. S. Atty., Newark, N. J. (Herbert J. Miller, Asst. Atty. Gen., David M. Satz, Jr., U. S. Atty., Newark, N. J., William W. Goodrich, Asst. Gen. Counsel, and William R. Pendergast, Atty., Dept. of Health, Education & Welfare, on the brief), for appellee.
Before BIGGS, Chief Judge, and KALODNER and FORMAN, Circuit Judges.
BIGGS, Chief Judge.

1
This is an appeal from an order of the court below entered February 21, 1962, directing the condemnation of a drug and enjoining the claimant, Marvin Schere, doing business as Jenasol Company (Jenasol), from re-introducing the drug into interstate commerce as labeled or as accompanied with certain labeling materials. The case arises under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq.

2
On May 15, 1958, approximately 438 copies of promotional leaflets for a drug known as "Jenasol RJ Formula `60' Capsules" were shipped by Jenasol from New York City to the home of O. E. Haughland, a Jensasol representative and sales agent, in Milton, Washington.1

3
On July 7, 1958, 23 bottles each containing 30 capsules of the drug itself, "Jenasol RJ Formula `60'", were shipped from New York by Jenasol to Haughland's home in Washington. Haughland stored both the previously shipped leaflets and the capsules themselves in his bedroom closet and kept the items there as stock for future sales. The leaflets, broken by Haughland into sets consisting of one copy of each of three different circulars and stapled together, were to be distributed to each customer purchasing the drug and also were to be used for advertising and promotional purposes.

4
The drug, "Jenasol RJ Formula `60' Capsules", contains as its featured ingredient a substance known as "royal jelly", which, simply described, is the special food fed by worker bees to a newly-hatched bee destined to become a queen. The drug contains certain well-known vitamins and minerals in addition to "royal jelly".2 The promotional leaflets shipped by Jenasol to its agent in the State of Washington for use with the capsules represent to the public that the drug would alleviate mental depression, loss of appetite, sexual weakness, nervousness, and several other ailments, and that it would increase "pep, energy and sexual drive".

5
Pursuant to an alias warrant of seizure and monition issued by the United States District Court for the Western District of Washington on August 7, 1958, the United States Marshal for that District seized 23 bottles of Jenasol capsules3 and several hundred sets of the promotional literature4 from the possession of Haughland, the Jenasol agent. The seizure was based on a libel of information filed by the United States which alleged that the capsules were misbranded in interstate commerce within the meaning of 21 U.S.C.A. § 352(a) in that the promotional literature accompanying the capsules constituted false and misleading labeling. The relief prayed for in the libel was that the court decree the condemnation of the article.

6
Jenasol Company intervened as claimant, and, pursuant to an order of the United States District Court for the Western District of Washington dated September 8, 1958, the case was transferred to the United States District Court for the District of New Jersey5 where trial was had before Judge Reynier J. Wortendyke, Jr.

7
In its opinion, filed on December 14, 1961,6 the court found as a fact that the literature was false and misleading as to the efficacy of the drug, concluded that the literature constituted "labeling" within the meaning of 21 U.S.C.A. § 321 (m), and stated that a decree of condemnation would be issued. Entry and issuance of the decree was stayed on motion by the claimant for clarification of findings of fact, pursuant to Fed.R.Civ.P. 52 (b), 28 U.S.C. Shortly after the stay, the United States moved to amend the libel to include a prayer for injunctive relief against the claimant. In a second opinion, filed February 6, 1962,7 the court specifically found that the labeling was false and misleading in all respects, deemed the libel amended to include a prayer for injunctive relief in accordance with the motion of the United States and granted the injunction against Jenasol. An order of condemnation and injunction against the claimant was issued on February 21, 1962.8 The appeal to this court followed.

8
Jenasol's first contention is that the leaflets seized with the drug do not constitute labeling within the meaning of the Federal Food, Drug and Cosmetic Act. Section 321(m), Title 21, U.S.C.A. provides: "The term `labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." It is clear from the stipulated facts that the material alleged to be labeling was not physically attached to the drug or its package. Determination of this issue, then, depends upon the construction to be given the statutory phrase "accompanying such article". We must, of course, have in mind the intent of Congress in enacting the Federal Food, Drug and Cosmetic Act. In United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943), it was said "The purposes of this legislation * * * touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection. Regard for these purposes should infuse construction of the legislation if it is to be treated as a working instrument of government and not merely as a collection of English words."9

9
The written material alleged to be labeling was, as we have stated, shipped by Jenasol from New York to Haughland in Milton, Washington on May 15, 1958, and the 23 bottles of the drug were shipped on July 7, 1958. The leaflets and the drug were stored by Haughland in his bedroom closet, unquestionably with the intent to use the leaflets with the drug for sales and promotional purposes. There is no evidence, however, that the leaflets were actually used in either respect.

10
The definitive test of whether literature can be said to accompany an article and thus constitute labeling within the meaning of the Act was set forth in Kordel v. United States, 335 U.S. 345, 350, 69 S.Ct. 106, 109, 93 L.Ed. 52 (1948): "One article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment one to the other is necessary. It is the textual relationship that is significant." The textual relationship and supplemental nature of the literature in the appeal at bar, the leaflets entitled "Miracle Bullets", "Jenasol Co.", "This is Our Unconditional Guarantee", and "Royal Jelly Passport to Health",10 is made obvious by a reading of these materials. Each explains the uses of the royal jelly product and the purported health benefits to be derived from it. It is clear then, that these materials together with the drug constitute parts of an "integrated distribution program". Kordel v. United States, supra, 335 U.S. at p. 350, 69 S.Ct. at p. 109; United States v. Lee, 131 F.2d 464 (7 Cir. 1942).11

11
It is true that the literature and the drugs shipped from Jenasol in New York to its agent in the State of Washington were sent on different dates and in different packages. This, however, does not alter the status of the literature as labeling, for there need not be physical accompaniment of the literature and the drugs to which they relate during the interstate journey. Kordel v. United States, supra. In V. E. Irons, Inc. v. United States, 244 F.2d 34, 39 (1 Cir. 1957), certiorari denied, 354 U. S. 923, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957), the Court stated: "It is clear that the term `labeling' must be given a broad meaning to include all literature used in the sale of food and drugs, whether or not it is shipped into interstate commerce along with the article." See also United States v. Urbuteit, 335 U.S. 355, 357-358, 69 S.Ct. 112, 93 L.Ed. 61 (1948). In United States v. 7 Jugs, Etc., Dr. Salsbury's Rakos, 53 F.Supp. 746, 755 (D.Minn. 1944), the Court said: "* * * [T]he printed matter and the drugs had a common origin. They had a common destination in that both were intended to come together * * *. They were interlocking units of a distributional scheme the objective of which was ultimate association and distribution together. * * * [T]hese booklets were prepared, shipped and distributed to dealers with the ultimate expectation and intention * * * that they would serve the purpose of labeling for the * * * articles * * * here involved. Without the booklets, the products themselves lacked labeling, at least in so far as informing purchasers of the purposes and uses of the remedies. The mere fact that the products were shipped at a different time, over a different route and were received at a different time from the booklets should not be permitted to confuse or obscure the substance of the matter."12

12
Jenasol insists, however, that for literature to be said to have accompanied a drug within the meaning of the Act there must have been actual use of the literature as labeling, and, it points out that the record is barren of any evidence of such actual use. United States v. Urbuteit, 336 U.S. 804, 69 S.Ct. 840, 93 L.Ed. 1052 (1949), and Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948), are cited in support of this position. In both cases, the Supreme Court referred to an actual use of the literature. A careful reading of the opinions, however, reveals that the Supreme Court was commenting on the fact that the literature had in fact been used as labeling. Due consideration was given to this factor of use by the Court, but it cannot be said that in doing this the Court promulgated or intended to promulgate a requirement that there be an actual use in order that the literature constitute labeling. Moreover, in United States v. 353 Cases * * * Mountain Valley Mineral Water, 247 F.2d 473, 478 (8 Cir. 1957), the same argument raised by Jenasol in the appeal at bar was asserted, and rejected by the court. The claimant urged that leaflets could not properly be deemed to be labeling "because of evidence that they had not been used by the distributor in connection with selling the [mineral] water * *. However, all of the pamphlets were obviously printed for use generally in promoting the sale of the water, and were useful for no other purpose. All of them were found in the place of business of the local distributor * * *." The Court concluded, supra, 247 F.2d at p. 480, that "all of the sales literature * * * was, as a matter of law, `labeling' * * *." The facts on the issue of use in United States v. 353 Cases, supra, are virtually identical with those in the instant appeal on the same question. See also United States v. 10 Cartons * * * Black Tablets, 152 F.Supp. 360 (W.D.Pa.1957); United States v. 4 Devices * * * Color-Therm, 176 F.2d 652 (10 Cir. 1949). But see Lee v. United States, 187 F.2d 1005 (10 Cir. 1951).13

13
We are of the opinion, in the light of the authorities cited or quoted, that the court below decided correctly that the literature in the case at bar constituted labeling within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq.

14
Jenasol next contends that the trial court erred in denying its motion to dismiss the libel of information for want of legally sufficient allegations of fact to support the assertion that the literature constituted labeling. We think that the district court was correct in denying this motion and that, therefore, Jenasol's contention is without merit. Paragraph II of the amended libel, that of August 7, 1958, alleges the shipment in interstate commerce of the leaflets by title, of the mat from which Haughland was to print, and from which he did print, another titled leaflet, and of the drugs. Paragraph IV alleges that the drug was misbranded "when introduced into, while in and while held for sale after shipment in interstate commerce" in that the leaflets, functioning as labelling, were false and misleading in the representations they made concerning the efficacy of the drug as treatment for specifically designated ailments. It is clear that the facts alleged in the libel show a "functional interdependence" between the promotional literature claimed to be labeling and the drug to which the literature refers, and the libel is, therefore, legally sufficient in this respect. See United States v. 8 Cartons * * * Molasses, 97 F.Supp. 313, 315 (W.D.N. Y.1951).

15
We now turn to a consideration on the merits of the claim of misbranding. A brief review of the pertinent statutory provisions is necessary.

16
Section 331, Title 21, U.S.C.A., the provision containing the basic prohibitions of the Federal Food, Drug and Cosmetic Act, provides: "The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." Section 352, Title 21, U.S.C.A., states that "A drug or device shall be deemed to be misbranded — (a) If its labeling is false or misleading in any particular."

17
Section 321(n), Title 21, U.S.C.A., provides: "If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the labeling is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual."

18
Statutory authority for the issuance of a decree of condemnation by the district courts is found in 21 U.S.C.A. § 334(a), which provides in pertinent part: "Any article of food, drug, device, or cosmetic that is * * * misbranded when introduced into or while in interstate commerce or while held for sale * * * after shipment in interstate commerce * * * shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned * * *." Broad authority for the issuance of an injunction is found in 21 U.S.C.A. § 332(a) (1962 Supp.): "The district courts of the United States * * shall have jurisdiction, for cause shown, * * * to restrain violations of section 331 of this title * * *."

19
The United States was required to bear the burden of proof at trial in order to establish that the labeling was false or misleading. Colusa Remedy Co. v. United States, 176 F.2d 554, 556 (8 Cir. 1949). To meet this burden, the testimony of nine expert and highly qualified witnesses was presented. These witnesses included in their number a research chemist specializing in food analysis, a specialist in nutrition, an endocrinologist, a pediatrician, a specialist in the field of geriatrics, and a pharmacologist. The testimony of these witnesses was based primarily upon controlled scientific and clinical tests performed by them or under their supervision and upon evaluations of the consensus of medical opinion. As to this latter evidence, see Research Laboratories, Inc. v. United States, 167 F.2d 410, 416 (9 Cir. 1948). See also 3 Wigmore, Evidence § 687 at p. 3 (3d Edition).

20
To rebut the Government's case, the claimant presented the testimony of two expert witnesses, Drs. Angel Lozano Abarca and Ricardo Galeazzi-Lisi. Dr. Abarca, a young Mexican physician in practice for five years, based his conclusions as to the efficacy of royal jelly on clinical experience with the substance, although he admitted that his knowledge of the composition and proper dosages of royal jelly was based on information given him by a veterinarian engaged in the distribution of royal jelly in Mexico City. Dr. Galeazzi-Lisi, a personal physician to the late Pope Pius XII, based his testimony as to the efficacy of the royal jelly on clinical experience also. However, he disclaimed any scientific or research qualifications, and apparently had kept no clinical records or controls.

21
The court below, after weighing the evidence, found that the United States had met its burden of proof and that royal jelly was not an effective treatment or palliative for human ailments as was claimed in the labeling. The court did find, however, that the evidence established that the vitamins contained in the capsules "may be" an effective treatment for some of the ailments enumerated in the labeling. Nonetheless, the court concluded that: "When read as a whole, the labeling creates and is intended to create the impression upon the sufferer of the stated ills that it is the royal jelly ingredient of the capsule which constitutes the efficacious palliative or therapeutic agent. I find this to be false, and the labeling as a whole consequently misleading. In view of this unmistakable implication of the labeling, the conclusion is inescapable that the labeling is false and misleading in all respects." United States v. 47 Bottles * * * Jenasol RJ Formula `60', 201 F.Supp. 915, 917 (D.N.J.1962).

22
Our review on appeal of findings of fact made by a district court is, of course, far from a plenary one. Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A., provides in part that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Whether or not labeling is false or misleading in any particular is a question of fact for determination by the trial judge in the absence of a jury. Colusa Remedy Co. v. United States, 176 F.2d 554, 561 (8 Cir. 1949). In United States v. Kaadt, 171 F.2d 600, 603-604 (7 Cir. 1948), the court said: "* * * [A] consensus of medical opinion is a question of fact * * * and * * * a conflict of medical opinion concerning the effectiveness of a drug also presents a question of fact."

23
The test of whether a finding of fact is "clearly erroneous" within the meaning of Rule 52(a) is definitively set forth in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The Supreme Court said: "A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." In the case at bar the trial judge made a choice between conflicting medical opinions. We cannot say that this constituted error, for there was an evidentiary basis for his resolution of the conflict. Colusa Remedy Co. v. United States, supra. See also Harry Alter Co. v. Chrysler Corp., 285 F.2d 903 (7 Cir. 1960). "* * * [A] choice between two permissible views of the weight of evidence is not `clearly erroneous'.", United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). Applying these standards, we are compelled to the conclusion that the findings of fact made in the court below are not clearly erroneous, and accordingly, they must be affirmed.

24
Moreover, we think that the district court was correct in its application of the pertinent legal standards as to what constitutes "false or misleading" labeling and in its conclusions of law on this question. The court properly ignored the fact that the capsules might have a beneficial effect on some persons as a result of the vitamin content. In United States v. One Device, Etc., 160 F.2d 194, 200 (10 Cir. 1947), the court said: "The objection is not to the use of this * * * [article] or that it does not have a useful place in the art of healing. The vice is in the way and manner in which it is represented and the claims which are made for it in these circulars * * *."14 Although it is possible, as the trial court found, that the vitamins in Jenasol capsules may indeed be effective in the treatment of some of the ailments mentioned in the literature, the clear and unmistakable tenor of the leaflets is that royal jelly will itself relieve the human illnesses and ailments enumerated therein. As was said by trial court: "It is upon the royal jelly that sufferers from the conditions stated are induced by the literature to pin their hopes and fasten their expectations of alleviation and restoration." 201 F. Supp. 915 at p. 917. In V. E. Irons, Inc. v. United States, 244 F.2d 34, 39-40 (1 Cir. 1957), certiorari denied, 354 U.S. 923, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957), the court stated: "In determining whether such labeling contained `false or misleading' statements, we must be careful not to read the literature with the eyes either of experts in nutrition or of overly skeptical buyers. What is pertinent is the effect the claims would have on those to whom they are addressed, namely, prospective purchasers and actual customers * * *, who cannot be presumed to have special expertness or to be unduly cautious, but who are more likely than not to be persons who are pathetically eager to find some simple cure-all for the diseases with which they are afflicted or who are susceptible to luridly painted scare literature as to the prospect of being disease-ridden unless they consistently partake of the vaunted drug product. This approach has been authoritatively approved."

25
It is true, as is pointed out in Jenasol's brief, that one of the leaflets, the one bearing the title "Miracle Bullets", contains as a disclaimer statement the following: "We make no claims for ROYAL JELLY. We have merely accumulated reports that have been made as a result of experimentation and research by Doctors, Scientists, and Nutritionists in many parts of the world. Many of these reports have been published in reputable publications, in official Journals, and before the International Congress of Doctors and Biogeneticists." Nonetheless, this technical disclaimer cannot cure the leaflet of its deceptive and misleading character as a whole. The disclaimer is located on the third page of the four page circular, in small type, and at the bottom of a column. Every other column or item in this newspaper format leaflet bears a headline in heavy, large type, whereas this disclaimer is simply issued as a final inconspicuous paragraph in a "news item" pointing out the research done on royal jelly. The single paragraph does not caution the reader of the leaflet that the representations made therein are, in fact, not representations at all, which is the alleged purpose of the disclaimer. The sweeping, remedial purposes of the Federal Food, Drug and Cosmetic Act, see United States v. Dotterwich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), cannot be thwarted by a payment of mere lip service to the duty to fairly represent to potential customers the efficacy of a drug product.

26
We conclude that the district court's findings of fact that the labeling as a whole is false and misleading are not clearly erroneous, and that its conclusions of law that the drug is misbranded are correct.

27
Jenasol's final contention is that the district court committed error when it granted the injunctive relief prayed for in the amended libel.

28
As has been said at an earlier point in this opinion, the trial court filed an opinion on December 14, 1961, stating that a decree of condemnation would be issued. As of the date of that opinion, and throughout the trial that preceded it, the prayer for relief in the libel requested only that a decree of condemnation be issued. There was no specific prayer for injunctive relief. On December 18, 1961, Jenasol moved for a stay of entry of judgment and for clarification of findings of fact. On January 16, 1962, while that motion was pending, an order to show cause having issued, the United States moved to amend the libel to include a prayer for injunctive relief. Both motions were argued on January 22, 1962, and decision was reserved. On February 6, 1962, the District Court filed a second opinion, in which it stated it would grant the motion to amend the libel, deem the libel to be amended to include a prayer for injunction, and grant the injunction. Thereafter, on February 21, 1962, the court entered a final decree, that appealed from, of condemnation and injunction.

29
The motion by the United States to amend its libel was expressly based on Rule 15(b), Fed.R.Civ.Proc., 28 U.S.C. This, in pertinent part, provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; * * * [T]he court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him * * *." Whether this motion, nominally brought under Rule 15(b), was one that could have more properly been brought under Rule 15(a),15 is a point we need not now determine, for under either rule the disposition of the issues presented lie within the discretion of the trial judge. See Caddy-Imler Creations, Inc. v. Caddy, 299 F.2d 79 (9 Cir. 1962). This discretion, while quite broad, is not unlimited and cannot be exercised in such a manner as to result in substantial prejudice to a party. Ricciuti v. Voltarc Tubes, Inc., 277 F.2d 809 (2 Cir. 1960).

30
We think that in the case at bar the trial judge did not properly exercise his legal discretion in granting leave to amend the prayer for relief at such a late stage in the proceedings. Assuming arguendo that the court below had jurisdiction over the person of the claimant so as to have the power to grant injunctive in personam relief, an issue we need not and therefore do not decide,16 we nonetheless think it unfair and substantially prejudicial to permit the injection of a new and different prayer for relief after trial at the very end of the case as was allowed here. But for the brief oral argument on the motion, Jenasol had no opportunity to raise and assert, through evidence or otherwise, equitable considerations by way of defense to an injunction or other possible mitigating factors. United States v. 184 Barrels Dried Whole Eggs, 53 F.Supp. 652 (E.D.Wis.1943), is not to the contrary although the court there permitted an amendment for injunctive relief in a Federal Food, Drug and Cosmetic Act case. However, the amendment in the cited case was made at an early stage of the trial. This is a very different thing than the allowance of a far-reaching amendment after trial and at the terminal stage of district court proceedings as was permitted here.

31
Accordingly, the judgment of the District Court will be affirmed as to the decree of condemnation but will be reversed as to the injunctive relief granted.

Notes:

1
47 bottles of the drug were shipped by Jenasol to Haughland on the same day, May 15, 1958, but were returned and shipped back to Jenasol by the agent shortly thereafter. See the stipulation of the parties

2
The label on the 30-capsule bottle of "Jenasol RJ Formula `60' Capsules" contains the following statement of ingredients: "Each capsule contains: Thiamine Hydrochloride (Vit. B-1) 10 mgm. 1000% MDR, Riboflavin (Vit. B-2) 5 mgm. 250% MDR, Pyridoxine Hydrochloride (Vit. B-6 ‡) 1 mgm., Ascorbic Acid (Vit. C) 50 mgm. 166% MDR, Vit. B-12 (Activity Equivalent ‡) 3 mcg., Folic Acid ‡ 0.2 mgm., Niacinamide † 30 mgm., Calcium Pantothenate * 2 mgm. ROYAL JELLY * 50 mgm. In a natural base of wheat germ oil (Vit. E)." The various symbols are indicated as follows: "MDR — Minimum Daily Requirement"; "‡ † Need established. MDR not established."; "* Need in human nutrition not established."

3
The libel and monition designated the res as 47 bottles of Jenasol capsules. Both parties stipulated, however, that these 47 bottles had been shipped back to Jenasol in New York prior to seizure, and that the seized res, consisting of 23 bottles, had been shipped by Jenasol to Haughland on July 7, 1958. See note 1, supra

4
Some of the literature had been printed in the State of Washington from a mat supplied by Jenasol in New York and sent to Haughland for that purpose

5
The transfer was made pursuant to 21 U.S.C.A. § 334(a), which provides in pertinent part: "* * * [T]he proceeding pending or instituted shall, on application of the claimant * * * be removed for trial to any district agreed upon by stipulation between the parties, or, in case of failure to so stipulate * * * the court of the district in which the seizure has been made * * * shall by order, unless good cause to the contrary is shown, specify a district of reasonable proximity to the claimant's principal place of business * * *."

6
United States v. 47 Bottles, More or Less, Jenasol RJ Formula 60, D.C., 200 F. Supp. 1 (1961)

7
201 F.Supp. 915 (1962)

8
The decree appealed from, in addition to ordering the condemnation of the res, enjoins the claimant "From introducing or delivering for introduction or causing to be introduced or delivered for introduction into interstate commerce any article of drug known as Jenasol RJ Formula `60' Capsules, or the same drug by any other name, or any similar article of drug, which is accompanied by any written, printed, or graphic matter which represents or suggests that the said article is an adequate and effective treatment for increasing sexual vitality, irritability, headaches, insomnia, physical and spiritual convulsions, depressions, restoring vitality, allevating ills of old age, improving memory, stimulating the appetite, normalizing growth of underdeveloped children, extending span of human life, digestive disturbances, activating glands of the body, physical and mental symptoms of approaching old age, tired eyes, and that the article is a `Natural supertonic' which `produces a pleasing state of relaxed well-being,' or any similar statements, which statements are false and misleading within the meaning of 21 U.S.C. § 352 (a) since the article is not adequate and effective treatment for such conditions and purposes."

9
See United States v. 7 Jugs, Etc., of Dr. Salsbury's Rakos, 53 F.Supp. 746, 752-753 (D.Minn.1944): "* * * [O]f paramount importance is the fact that the Federal Food, Drug and Cosmetic Act is an enactment under the Commerce Clause. * * * One of the most important enactments under the Commerce Clause, its purpose of protecting the public health and pocketbook against adulterated and misbranded food and drugs, has led courts to declare with unanimity that food and drug legislation should be given a liberal construction in order to accomplish its remedial purposes
* * * * *
"Realizing that Congress was attempting to expand the protection given consumers in redefining the concept of misbranding, it is evident that the word `accompany' should be given an interpretation which accords with the Congressional purpose."

10
The latter leaflet, entitled "Royal Jelly Passport to Health", was printed by Haughland in Washington from a mat supplied by Jenasol in New York

11
That the literature in the case at bar might be said to be advertising material is of no moment, for advertising can and, in the instant case, does serve the function of labeling. See Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948); United States v. Urbuteit, 335 U.S. 355, 69 S.Ct. 112, 93 L. Ed. 61 (1948)

12
In United States v. Research Laboratories, 126 F.2d 42, 45 (9 Cir. 1942), the court stated: "* * * [It is not material], whether the packages and the circulars did or did not travel in the same crate, carton or other container or on the same train, truck or other vehicle during their interstate journey. The packages and the circulars had a common origin and a common destination * * *. Clearly, therefore, they accompanied each other, regardless of whether, physically, they were together or apart during their journey."

13
See United States v. Lee, 131 F.2d 464, 466 (7 Cir. 1942): "There can be no question that among the usual characteristics of labeling is that of informing a purchaser of the uses of an article to which the labeling relates, and that the basic character of the Federal Food, Drug and Cosmetic Act is not directly concerned with the sale of the products therein described or whether the literature is carried away by the purchaser. It was enacted to protect the public health and to prevent fraud, and it ought to be given a liberal construction. Consequently, we are compelled to the conclusion that misbranding is cognizable under the Act while the articles are being held for sale."

14
"It must be remembered that a representation may be `misleading' from the very fact of overemphasis and exaggeration, even though the product in question may be helpful, and in some circumstances useful, though not really indispensable to good health." V. E. Irons, Inc. v. United States, 244 F.2d 34, 43 (1 Cir. 1957), certiorari denied, 354 U.S. 923, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957)

15
Rule 15 (a) provides in part: "A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if * * * no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court * * *; and leave shall be freely given when justice so requires."

16
As we are able to decide this portion of the appeal on the issue of whether or not the trial judge abused his discretion in granting the amendment, we expressly do not resolve the interesting question of whether the claimant has made a general and unlimited appearance in the case and has thereby conferredin personam jurisdiction on the court, or whether such in personam jurisdiction has been conferred by consent or waiver.