UNITED STATES of America,
Libellant,

v.

An article of drug consisting of 47 BOT-
TLES, MORE OR LESS, each contain-
ing 30 capsules of an article labeled in
part: " * * * JENASOL RJ FOR-
MULA 60 * * *", Respondent,

(Marvin Schere d/b/a the Jenasol Co.),
Claimant.

Civ. A. No. 1042–58.

United States District Court
D. New Jersey.

Dec. 14, 1961.

See also 26 F.R.D. 4.

**2**

David M. Satz, Jr., U. S. Atty., by Jerome D. Schwitzer, Asst. U. S. Atty., Newark, N. J., and William Goodrich, Gen. Counsel Dept. of Health, Education & Welfare, Food and Drug Administration, Washington, D. C., by William J. Risteau, Alexandria, Va., for the Government.

Bass & Friend, by Milton Bass, New York City, for claimant.

WORTENDYKE, District Judge.

This is a seizure case under the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 et seq. The subject matter of the seizure is a quantity of drug labelled "Jenasol RJ Formula 60" capsules or "Jenasol" containing as active ingredients a substance designated as "Royal Jelly"[1] and certain vitamins.[2]

The libel of information charges misbranding within the meaning of 21 U.S. C.A. § 352(a), because labelling claims as to the therapeutic effectiveness of the drug are false and misleading. It is represented in the labelling that the product will cause a person who ingests it to obtain increased sexual vitality, relief from irritability, headaches, insomnia, physical and spiritual convulsions, and depression, restoration of vitality, alleviation of the ills of old age, improvement of memory, stimulation of appetite, normalization of the growth of under-developed children, extension of life-span, palliation of glandular activation, alleviation of the physical and mental symptoms of approaching old age, help for tired eyes, and the achievement of a pleasing state of relaxed well-being.

In addition to the issue of fact posed by the charge that the claims are false and misleading, two questions of law are raised, namely: (1) whether the printed matter seized with the article of drug constitutes labelling within the meaning of 21 U.S.C.A. § 321(m), and (2) whether the evidence disclosed a substantial difference of medical opinion with respect to the claims upon which the issue of fact arises. Having charged misbranding, the burden rests upon the Government to support the accusation by competent evidence. Chichester Chemical Co. v. United Sates, D.C.Cir. 1931, 49 F.2d 516. In undertaking to discharge this burden the Government called nine expert witnesses, whose identity, qualifications and opinions were as hereinafter summarized.

Howard Smith, a chemist in the field of food analysis, conducted a "regular" food analysis on pure royal jelly for the purpose of determining the percen-

---

1. 3 Encycl.Brit. 11th Ed. 628 (Title: Bee) "It is believed that from the nature of the cell in which she is ovipositing, the queen derives a reflex impulse to lay the appropriate egg—fertilized in the queen or worker cell, unfertilized in the drone cell, * * *. Whether the fertilized egg shall develop into a queen or a worker depends upon the nature of the food. All young grubs are at first fed with a specially nutritious food, discharged from the worker's stomach, to which is added a digestive secretion derived from special salivary glands in the worker's head. If this 'royal jelly' continue to be given to the grub throughout its life, it will grow into a queen; if the ordinary mixture of honey and digested pollen be substituted, as is usually the case from the fourth day, the grub will become a worker."

2. The label upon the container of the drug states: "Each capsule contains: Thiamine Hydrochloride (Vit. B–1) 10 mgm. 1000% MDR. Riboflavin (Vit. B–2) 5 mgm. 250% MDR. Pyridoxine Hydrochloride (Vit. B–6) 1 mgm., Ascorbic Acid (Vit. C) 50 mgm. 166% MDR, Vit. B–12 (Activity Equivalent) 3 mcg., Folic Acid 0.2 mgm., Niacinamide 30 mgm. Calcium Pantothenate 2 mgm. Royal Jelly (need in human nutrition not established.) 50 mgm In a natural base of wheat germ oil (Vit. E)."

tages of protein, sugars, acid and ash contained therein; and found that the ingredients of the royal jelly aggregated a total of 100.7%.

Dr. Paul Gyorgy, specializing in nutrition and pediatrics, the discoverer of certain vitamins and an author and professor in his fields, testified, on the basis of knowledge of royal jelly, derived from scientific literature dealing therewith, that Jenasol would have none of the effects claimed in its labelling, except in cases of loss of appetite resulting from insufficiency of the thiamin vitamin. He was further of the opinion, based upon his studies and professional contacts, that there was no basis for believing that royal jelly is useful in the treatment of any disease.

Dr. Herbert S. Kupperman, Associate Professor of Medicine, specializing in the fields of endocrinology and clinical pharmacology, had made a study prior to the institution of the present litigation for the purpose of determining the effects of ingested royal jelly upon the human body with particular reference to the endocrine glands, the libido, and the gonadal function of the human male. His study involved the administration of royal jelly to a number of rats, and a comparison of its effect, with that of an inert substance, upon the weights of the adrenals, testes, prostate, seminal vesicles, levator ani muscles, thymus, thyroid and pituitary glands of the animals. Finding that the weight of these organs was not affected by the administration of the substance, Dr. Kupperman concluded that royal jelly had no hormonal or other effect on the male sex organs. It was, moreover, his opinion that the results obtained from the administration of the substance to the rats would be similar in the case of human beings. Supplementing his tests upon rats, he administered the product to several healthy males. He observed no effect of the tests, except the development of diarrhea in the patients. In a second test on human beings, the Doctor administered the royal jelly to seven patients who suffered from problems relating to fertility and libido, with glandular deficiencies. By measuring the quantity of steroid substances, an index of the activity of the male sex organs, in the blood and urine of the patients, and comparing the findings with those present prior to the administration of the royal jelly, no significant differences were manifested. Dr. Kupperman concluded from these tests that none of the patients had experienced any enhancement of libido, increase in sperm count, or change in sterility. His findings that the substance administered did not enhance potency was based upon information given him by the patients. In sum, it was the opinion of Dr. Kupperman that the Jenasol formula would not be effective in the treatment of the diseases and conditions for which it was recommended in its promotional literature, and that his opinion thereon represented the informed medical consensus upon the subject.

Another witness for the Government was Dr. Lewis Barness, an Associate Professor Pediatrics and board-certified specialist therein, who had conducted research in nutritional pediatrics. It was his opinion that royal jelly was not a recognized treatment for underdeveloped children. He had administered Jenasol to six underdeveloped children for thirty days, and noted no improvement, and he testified that he would not prescribe the Jenasol formula for such patients because it did not contain vitamins A or D. Throughout his participation in meetings of physicians and other scientists, and his connection with medical schools, Dr. Barness had never heard any discussion regarding royal jelly.

Dr. William H. Lewis, a medical professor presently associated with the Sloan-Kettering Medical Center, and an author of articles and books dealing with diseases connected with the aging process, voiced the opinion that the Jenasol product, except as a B-vitamin supplement when necessary, was ineffective for the geriatric diseases, and that royal jelly was not recognized as a treatment for them. The substance had been test-

ed at the institution with which he was connected as a possible cancer remedy, and found to be ineffective for that purpose as well.

Dr. Ernest J. Umberger, a pharmacologist employed by the Food and Drug Administration, specializing in the study of glands, had administered royal jelly to rats. He found through two tests that the animals to which royal jelly had been given did not react any differently than did the control, and concluded, therefore, that royal jelly did not stimulate the ovaries or adrenal glands at which the tests were directed. In a third study, this doctor administered royal jelly and a control to castrated male rats in an effort to determine the presence of male sex hormonal activity and growth stimulant effects, if any. He found no such activity as a result of the administration of the substance, and concluded, as the result of several tests, that royal jelly contained no substance stimulative of the adrenal gland, and also that it had no toxic effect.

Another expert witness who testified in behalf of the Government was Dr. Arthur Grollman, who had been teaching medicine at Johns Hopkins University and at the University of Texas over a period of thirty-eight years. He is a prolific writer on medical subjects and the recipient of numerous academic honors and fellowships, including an honorary professorship of medicine at the University of Guadalajara, Mexico. He has studied and written upon the subject of royal jelly, which he recognizes as a plentiful source of pantothenic acid. It was his considered opinion that the Jenasol product would not be effective in the treatment of any of the conditions mentioned in its labelling, except in cases of certain well-defined vitamin deficiencies. Dr. Grollman also confirmed Dr. Umberger's opinion that the results of the tests which the latter made upon rats were significant of similar effects upon human beings. Dr. Grollman stated that the antibiotic activity of royal jelly was but a negligible fraction of that afforded by the usual dosage of bacitracin, streptomycin, polymixin, neomycin and penicillin. The doctor also stated that he knew of no medical school in which the use of royal jelly as a therapeutic agent was taught, and that his opinion represented the consensus of medical opinion on the subject.

The case of the Government concluded with the testimony of Mr. Bernard Arrett, an employee of the Division of Antibiotics of the Food and Drug Administration. He had made certain tests to determine the effect of royal jelly in Jenasol as inhibitors of bacterial growth. From these experiments he found that the antibiotic activities of the substances lay in the range attributable to such foods as honey, sugar, butter, milk, green peppers, foods having a high salt content, and cranberries.

The evidence adduced in behalf of the claimant was in the form of testimony by Dr. Angel Lozano Abarca, a thirty-three year old Mexican physician with a background of only five years' practice, and Dr. Ricardo Galeazzi-Lisi, formerly a physician to the Pope, who admitted that he was neither a scientist nor a researcher, and had kept no records of his clinical use of royal jelly.

Dr. Abarca testified that he had employed royal jelly principally for the treatment of physical impotency in men with favorable results in 80% of the cases treated. He explained the absence of response in the remaining 20% by the presence of diabetes in those unresponsive cases. The doctor was, however, of the opinion that royal jelly was effective in the treatment of diabetes, and testified that he had used it for that purpose. He also stated that he had used the substance in the treatment of some accompaniments of old age, including arthritis, with apparently resultant improvement. His admitted source of knowledge respecting the composition and effects of royal jelly was, however, information which he obtained from a veterinarian, Hector Lopez Arista, who was engaged in the business of distributing royal jelly in Mexico City, and who had worked out for Dr. Abarca the dosages to be used. The

witness conceded that he had no knowledge of any recommendations for the use of the substance in medical textbooks, or in medical schools, and his opinion as to its efficacy for the purposes stated in the labelling was based only on his own work, and the "study" of the veterinarian, whose testimony was not presented.

Dr. Galeazzi-Lisi initially claimed that he had administered royal jelly to "many thousands" of persons since he first learned of it in 1947 or 1948; but later in his testimony the doctor reduced his estimate of the number of subjects from thousands to hundreds. He testified that he used the drug primarily in efforts toward the retardation of the aging process and in the treatment of the symptoms associated with old age; also, but to a lesser extent, as a means of increasing the weight of underdeveloped children. He claimed to have achieved favorable results in these directions. He was unable to afford any specific information concerning the food value or protein content of royal jelly, or to name any one of the forty ingredients of which he claimed it was composed. He testified further that he was currently experimenting with royal jelly in the treatment of cancer. He reiterated his disclaimer of any scientific or research qualifications in that field.

The article seized in this case consisted of 23 bottles of a substance called "Jenasol RJ Formula 60" which was shipped by the claimant Jenasol Company from New York City on July 7, 1958, to O. E. Haugland, Route 2, Milton, Washington, a field representative, salesman and agent for the shipper in the State of Washington. 438 copies of written, printed and graphic matter, shipped by the claimant to the same consignee on May 15, 1958, were also seized. These consisted of a folder entitled "Miracle Bullets" a leaflet entitled "Jenasol Co." and a reorder leaflet entitled "This is Our Unconditional Guarantee". Also seized were 306 copies of a leaflet entitled "Royal Jelly Passport to Health", printed locally by Haugland in Milton, Washington, from a "mat" supplied to

him by the Jenasol Company. The 438 copies of the written, printed and graphic matter above referred to were shipped in a single carton, removed therefrom by the consignee, and assembled into sets consisting of one copy of each of the three foregoing categories, stapled together. Haugland would deliver a "set" of this literature with each bottle of Jenasol capsules sold and delivered to a customer. He also distributed such "sets" to prospective customers as sales inducements. The bottles of Jenasol capsules seized had not been ordered by Haugland to comply with any specific request from a customer, but only in his capacity as field representative and agent for Jenasol, as part of his stock to be thereafter sold. Prior to the time of seizure, the capsules and literature seized were being stored by Haugland in his bedroom closet for future sales purposes.

The Court was furnished with a translation into English of what purport to be excerpts from the proceedings of the first international conference for the study of bees' products in the medico-biological field, at Bologna, Italy, in 1956, entitled "Observations on Feeding of Prematures with Royal Jelly." The discussion suggests that the effect of royal jelly upon the queen bee justifies the assumption that the same substance may be usefully employed in the nutrition of premature human babies. From a review of nine specific cases treated with the substance, the conclusion is drawn that the use of royal jelly as an integrative of the aliment for immature babies promises satisfactory results.

The claimant attacks the testimony of the witnesses for the Government upon the grounds that they lack sufficient basis for expert knowledge, and have not received adequate instruction in the medical field. Claimant further impugns the competency of those witnesses by reason of their ignorance of all component ingredients of royal jelly, and the inconclusiveness of their experiments (except those of Dr. Kupperman). It is claimant's contention that libelant has failed to discharge its burden of proof that

royal jelly is not therapeutically effective for the conditions claimed in the labeling, and that the evidence discloses that there exists a conflict of scientific opinion as to the efficacy of the substance for the purposes enumerated.

Claimant affirmatively asserts that its witnesses are the only qualified experts upon the critical issue, and that their opinions, which rest upon clinical observations, are conclusive of the therapeutic efficacy of royal jelly for the conditions claimed in the labeling.

It is the efficacy of the royal jelly component in the Jenasol formula which is the bone of contention in this case. Indeed, it is the unknown constituent in royal jelly which is relied upon by the claimant as the efficient cause of the therapeutic benefits recited in the labeling. Claimant's contention respecting the beneficence of royal jelly is a deduction from an assumption that because the queen bee thrives upon the substance, while the other members of the hive, without it, fail to enjoy her vigor and longevity, its administration to human beings must be productive of comparable results. There has been no showing in the evidence in this case that a human being is likely to react to the ingestion of royal jelly in any manner, direction or degree similar to the reaction of the queen bee to the inclusion of such a substance in her diet. If, as the claimant contends, the results of the administration of royal jelly to rats are irrelevant to the effects of the substance upon human beings, the effects of the substance upon the queen bee are certainly not to be compared to those which may be expected in the case of human babies or old people. Recognizing, however, that the burden of proof of inefficacy is imposed upon the Government in this case, we look to the net effect of the evidence proffered in support of its contention as compared with that offered by the claimant. The latter argues that because no one has succeeded in completely analyzing the composition of royal jelly, it cannot be said that it lacks a component which might be efficacious in the treatment of the conditions set forth in the labeling. The Government contends, however, that reliable medical opinion negatives the efficacy of the substance for some, if not for all of the objects set forth in the labeling.

 The statute, 21 U.S.C.A. § 352 (a) defines as misbranding a drug whose labeling is false or misleading in *any* particular and renders the drug liable to seizure if it is misbranded. Labeling, as used in the statute means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article" 21 U.S.C.A. § 321 (m). In order to justify the present seizure, the Government is required to show by the preponderance of the evidence that the labeling of the drug is false or misleading in some particular. No fraudulent intent on the part of the claimant need be shown as is required to sustain a fraud order of the Postmaster General. American School of Magnetic Healing v. McAnnulty, 1902, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90. See also Reilly v. Pinkus, 1949, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63. To sustain its burden of proof in the present case, the Government must show by the greater weight of the believable evidence that the Jenasol labeling is false or misleading in some particular. United States v. Kaadt, 7 Cir. 1948, 171 F.2d 600.

 I conclude from the substantial evidence which has been produced before me in this case that the Government has sustained its burden of proof. Whether a consensus of medical opinion exists respecting the effectiveness of the seized drug for the purposes claimed in the labeling, and whether there is a conflict in the medical opinion in that regard, are issues of fact which I am called upon to resolve in the case. Seven Cases v. United States, 1916, 239 U.S. 510, 36 S.Ct. 190, 60 L.Ed. 411, L.R.A.1916D, 164; United States v. Kaadt, supra; United States v. Dr. David Roberts Veterinary Co., 7 Cir. 1939, 104 F.2d 785. The substantiality of the evidence inducive of my conclusion finds support in the criteria enunciated in venerable au-

thority. 3 Wigmore, Evidence § 687 at 3 (3d Ed. 1940); United States v. Wood, 4 Cir., 1955, 226 F.2d 924; Irwin v. Federal Trade Commission, 8 Cir. 1944, 143 F.2d 316; John J. Fulton Co. v. Federal Trade Commission, 9 Cir., 1942, 130 F.2d 85, cert. den. 1942, 317 U.S. 679, 63 S.Ct. 158, 87 L.Ed. 544; Neff v. Federal Trade Commission, 4 Cir. 1941, 117 F.2d 495.

That the printed material in which the alleged false and misleading representations were set forth constitutes labeling within the meaning of the Act is obvious, because that material, together with the drug itself, constitute "parts of an integrated distribution program" as disclosed on the face of the material and in the stipulated facts. Kordel v. United States, 1948, 335 U.S. 345, 350, 69 S.Ct. 106, 110, 93 L.Ed. 52; United States v. Urbeteit, 1948, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61; United States v. 353 Cases * * * Mountain Valley Mineral Water, 8 Cir., 1957, 247 F.2d 473; United States v. 4 Devices * * * Color-Therm, 10 Cir., 1949, 176 F.2d 652; United States v. 10 Cartons * * * Black Tablets, D.C.Pa.1957, 152 F.Supp. 360.

To discharge its burden of proof under the statute, the government was required to adduce substantial evidence tending to show that the labeling was "false or [note disjunctive] misleading in any particular." 21 U.S.C.A. § 352(a); United States v. Hoxsey Cancer Clinic, 5 Cir. 1952, 198 F.2d 273, cert. den. 1952, 344 U.S. 928, 73 S.Ct. 496, 97 L.Ed. 714; United States v. Six Dozen Bottles * * Dr. Peter's Kuriko, 7 Cir., 1947, 158 F.2d 667; Goodwin v. United States, 6 Cir. 1924, 2 F.2d 200. The ample evidence to be found in the testimony of the witnesses for libelant that the drug was not an effective agent in the treatment of headaches, tired eyes, spiritual or physical convulsions was not even contradicted by claimant, who did not even explain what was meant by "spiritual convulsions" as used in the labeling.

Despite the ostensible relation of the representations in the labeling to the synergistic effect of all the ingredients of the Jenasol capsule, a careful reading of the printed matter in conjunction with a fair interpretation of claimant's evidence leads one to the inevitable conclusion that it is the royal jelly in the formula which renders the drug efficacious for the represented purposes. Although in its circular entitled "Miracle Bullets", claimant states that it makes no claims for Royal Jelly, all of claimant's evidence related only to the efficacy of royal jelly in the field of pediatrics and gerontology. In any event, the labeling, when read as a whole is, at best, misleading. United States v. 38 Dozen Bottles * * * Tryptacin, D.C.Minn. 1953, 114 F.Supp. 461.

A decree of condemnation will be entered against the articles seized in this case, which shall direct the destruction thereof, and for the award of costs to libelant against the claimant. This opinion shall constitute the findings of fact and conclusions of law required by F.R. Civ.P. rule 52(a), 28 U.S.C.A.