**UNITED STATES of America, Plaintiff,**

**v.**

**ARTICLES OF DRUG consisting of the following: 27/1000 tablet bottles, more or less, LABELED in part: "1000 Tablets COLCHICINE 1/100 gr. (0.6 mg.) \* \* \* Caution \* \* \* Distributed By a Division of Consolidated Midland Corporation Katonah New York" (bottle label coded "2330029"), etc., Defendant in Rem.**

**No. 76 Civ. 2444.**

United States District Court,
S. D. New York.

Jan. 10, 1978.

---

5. The indictment was returned on September 17, 1976.

**1238**

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, William J. Kelleher, Asst. U. S. Atty., for plaintiff; Charles H. Johnson, Asst. Chief Counsel for Enforcement, F. D. A., Rockville, Md., of counsel.

Bass, Ullman & Lustigman, New York City, for Consolidated Midland; Robert Ullman, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

*The Proceedings and Parties' Contentions*

These proceedings for forfeiture were instituted on June 1, 1976, pursuant to the provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, with the filing of a complaint for the destruction and condemnation of certain specified lots of a drug named colchicine, and various lots of a drug called dihycon diphenylhydantoin, manufactured by Barr Laboratories, Inc. and by Ormont Drug & Chemical Co., respectively and repackaged by claimant, Consolidated Midland Corporation preparatory for shipment and distribution in interstate commerce. Pursuant to a warrant issued by this court, the articles were seized by United States Marshals on June 18, 1976, as authorized by 21 U.S.C. § 334(a)(1). Consolidated filed a claim for the seized articles and an answer to the complaint in August, 1976.

The complaint alleges that the claimant has introduced the affected drugs (dihycon diphenylhydantoin and colchicine) into interstate commerce in violation of 21 U.S.C. § 355. The complaint further alleges that certain lots of colchicine and dihycon phenytoin are mislabeled and misbranded; that the claimant failed to conform to current good manufacturing practice as required and concretized by regulations promulgated by the Secretary and set out at 21 C.F.R. § 200.31 and §§ 211.1 through 211.115 in respect of the processing, packaging, labeling or holding of the affected articles to insure that the statutory and regulatory requirements as to safety, identity, strength, quality and purity characteristics are met; and that hence the drugs are adulterated and misbranded within the meaning of 21 U.S.C. § 351(a)(2)(B).

Defendant claims that it is not in violation of 21 U.S.C. § 355 because its dihycon was in commercial use before the 1962 amendments to the Food, Drug & Cosmetic Act and accordingly that the drug is grandfathered and exempt from compliance with § 355; that while there may be evidence of technical deviations from current good manufacturing practice, there has been no showing that these deviations affected in any way the safety or other characteristics of its colchicine and dihycon; and that the alleged misbranding was a pure, minor technical violation, since even though la-

beled "100 capsules," the packets in question were transparent and clearly revealed the actual number of capsules therein.

The case was tried to the court on May 24–May 27, 1977. The filing of post trial proposed findings, conclusions and memoranda was completed on November 9, and the exhibits were submitted to the court on November 23.

*The Evidentiary Facts*

Prior to the institution of these proceedings Frederick Lochner, an inspector for FDA, made an inspection of claimant's plant. He was given claimant's Standard Operating Procedure (SOP) designed to verify that claimant's processing, packaging, handling and labeling of its articles conform to good manufacturing practice. He found that the SOP was in draft form only; shipments were made without a notation thereof being recorded on the product's invoices, part of the lot numbers were missing from some labels, and claimant's address was incorrectly listed on some labels. The protocol assay relied on as insuring the identity, stability and quality of the dihycon drug was four years old and inadequate on its face, but no new tests had been taken by the claimant. Articles were repackaged from lots before examination, identification or receipt of assays, and distributed without analysis being performed by the packager to insure the identity and quality of the article. Quality control procedures were not scrupulously adhered to. While the SOP itself seems to require that good manufacturing practice be followed, the practices actually in operation were such that the claimant would be unable to verify that the SOP was in fact followed in the processing, repackaging and handling of the articles. Labeling procedures were such that the identification, history and manufacture of the batch from which the finished product was repackaged and labeled could not be validated. The claimant was unable to supply the inspector with stability data as to the affected articles. Lots of the affected articles had been held for long periods and repackaged without testing to assure

that there had been no deterioration in strength or quality. There were 42 packet lots of dihycon diphenylhydantoin, each identified as containing 100 capsules, but actually each contained only six capsules. This testimony stands virtually uncontroverted and is accepted and adopted as part of the court's findings.

Dr. Murray Tuckerman, Professor of Pharmaceutical Economics and Health Care Delivery at Temple University, testified that everything the firm does from receipt of the material until it is shipped from the plant should be listed on the SOP, and the reason and purpose for doing this is to insure that a safe and effective product leaves the plant. SOP saves the company from being required to give specific and separate instructions to each employee each time the material is handled. While there is flexibility in re the form of the SOP, it should be complete and indicate how the material is to be received and processed, what records are to be kept, what is to be done with the records under various contingencies, what must be done to release the material, who has responsibility for what, what are the procedures in the packaging process, what examinations are to be undertaken prior to the materials' release and under what conditions will release be withheld. He considered the SOP here deficient because no procedures are required to enable management to confirm that what is set out in the SOP as a requirement is operationally accomplished. Articles of drugs were repackaged from lots on receipt by Consolidated and before any examination or identification of the drugs by Consolidated personnel and before any receipt of protocols of assay. The drugs were distributed without Consolidated having on hand either an analysis of the product from the manufacturer and/or an analysis being made by Consolidated itself, and lots of the drugs were repackaged prior to being released by quality control for that purpose. Consolidated's labeling operations do not require procedures to insure identification of the labeled products with any specified lot or controls that would permit a determination of the history of the processing and manufacture of the labeled batch.

Dr. Harold Booker, a neurologist, on the faculty of the Department of Neurology in the School of Medicine of the University of Wisconsin, testified for the government. For the past 12 years his exclusive professional activity has been the diagnosis and treatment of epilepsy along with research in the use of drugs in the treatment of that disorder. He has treated some 2,000 epilepsy patients with phenytoin. Since the rate of absorption of different brands of phenytoin varies, he has found it best if a patient becomes stabilized on one brand, not to change to another. Because there are various undesirable side effects from use of the drug, Dr. Booker's practice and recommendation is that only the minimum amount of phenytoin that will suffice to prevent epileptic seizures in the particular patient should be administered. Among these side effects are overgrowth of gums, stimulation of the growth of body hair, interference with the functioning of Vitamins D and K, and formation of folic acid. He does not use or prescribe the use of dihycon which is the only time release phenytoin he is familiar with because he is unaware of any data establishing its absorption characteristics, which he regards as critical. Without such established data, he does not regard dihycon as safe and effective for use under the conditions prescribed.

Dr. Richard Gural, an FDA administrator and pharmacokinetist, was also a government witness. His FDA function is to evaluate data submitted to the agency to document the effectiveness and safety of a drug intended for marketing. He received a submission by Consolidated re dihycon. In evaluating a drug, he applies a series of mathematical equations to the time course of the drug in the blood stream to determine its rate of absorption, distribution, metabolism and excretion. He stated that an abbreviated new drug application does not necessitate the extensive data required of a new drug application because the abbreviated new drug application seeks approval for marketing a drug that is the same or the equivalent to one already on the market. With such application a bioequivalency study should be done comparing the new drug with the old one already on the market. He concluded that Consolidated's submission did not establish that its dihycon was safe and effective on the basis of bioequivalency and bioavailability data (rate of the drugs' absorption and availability at drug site) in respect to dilantin, a single dosage form of phenytoin now on the market.

Charles Peppinger, a clinical pharmacologist and an Assistant Professor of Neuropharmacology at the College of Physicians and Surgeons of Columbia University, testified that he had worked for some 15 years with phenytoin in the treatment of epilepsy. He had undertaken the study of time release phenytoin by switching patients on single dose dilantin to a time release preparation. The patients began having seizures, and he concluded that the drug was not safe and effective for the relief of epilepsy.

Consolidated's expert Dr. Alexandra Feldmann, a practicing physician from Rochester, testified that over the past ten years she had used dihycon on what she estimated to be roughly 200–250 of her patients with good results. Robert Goldman, a pharmaceutical chemist, testified that his employer NYSCO Laboratories had manufactured phenytoin in time release form in the 1950's and had manufactured this drug for Consolidated in the late 1950's and earlier. Jaap Ketting, claimant's President, testified that Consolidated had purchased time release phenytoin from NYSCO Laboratories from 1959 until 1972 when the premises were closed. Since that time another pharmaceutical manufacturer has supplied them with the drug manufactured under the NYSCO formula.

There was no testimony by any of the experts for the claimant or the government that there was in existence and available any body of literature or other documentary source attesting to the safety and effectiveness of time release phenytoin (or of dihycon specifically) in the treatment of epilepsy.

### Discussion

The court has jurisdiction pursuant to 21 U.S.C. § 334. Consolidated Midland Corpo-

ration operates a plant in Katonah, N.Y., where it repackages for shipment in interstate commerce various lots or batches of drugs manufactured elsewhere, including the tablets of colchicine and packets of dihycon, the articles of drugs which are the subject of this litigation.

Dihycon diphenylhydantoin is a drug within the meaning of the Food, Drug & Cosmetic Act, 21 U.S.C. § 321(g) since it is intended for use in the diagnosis, cure, mitigation and prevention of grand mal epilepsy, and colchicine is also a drug within the meaning of the act since it too is intended for use in the diagnosis, cure, mitigation and treatment of disease and is recognized in the United States Pharmacopoeia.

The evidence conclusively establishes that Consolidated, in the preparation and repacking of its dihycon and colchicine, did not conform to current good manufacturing practice as defined in 21 C.F.R. § 211.1(a) which states that the "criteria in §§ 211.20–211.115, inclusive, shall apply in determining whether the methods used in, or the facilities or controls used for, the manufacture, processing, packing, or holding of a drug conform to or are operated or administered in conformity with current good manufacturing practice to assure that a drug meets the requirements of the act as to safety and has the identity and strength and meets the quality and purity characteristics which it purports or is represented to possess as required by section 501(a)(2)(B) of the act." The evidence disclosed specific non-conformity to 21 C.F.R. § 211.40(g) and § 211.42(d) (failure to test representative samples of dosage form dihycon to determine conformity with specifications before distribution); to § 211.42(b) (failure to take an adequate number of samples from representative numbers of containers in each lot and test to establish specific identity); to § 211.58(e) (lack of any adequate provision for checking identity and strength); to § 211.58(g) (no properly identified reserve samples retained); to 211.58(h) (no provision for retaining complete laboratory data on each lot or batch); to § 211.60 (no tests to assure stability); and to § 211.80 (failure to control the packaging and labeling opera-

tions to insure that the packaged drug conforms to standards and is properly identified by label).

The Federal Food, Drug & Cosmetic Act must be construed with sensitive awareness of its overall purpose to protect the lives and health of the consumer public from hazards against which the consumer has no defense. *See United States v. Dotterweich*, 320 U.S. 277, 280, 64 S.Ct. 134, 88 L.Ed. 48 (1943); *United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240, at 245 (2d Cir., Dec. 15, 1977). The Secretary's interpretive regulations as to what constitutes good manufacturing practice concretize the statutory language of 21 U.S.C. § 351(a)(2)(B), eliminate the possibility of vagueness, *United States v. An Article of Drug Consisting of 1 Drum of 104,000 tablets, etc.*, 484 F.2d 748 (7th Cir. 1973), see also *United States v. Bel-Mar Laboratories, Inc.*, 284 F.Supp. 875 (E.D.N.Y.1968), and have the binding force of law. *See National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 696 (2d Cir.), cert. denied, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).

21 U.S.C. § 352(a) provides that a drug is to be deemed misbranded when its labeling is "false or misleading in any particular," and § 352(b)(2) provides that a drug is misbranded if in package form unless it bears a label containing "an accurate statement of the quantity of the contents in terms of weight, measure or numerical count . . . ." It is clearly established on the record that the 42 packet lots of dihycon capsules containing the statement "100 capsules" whereas there are only 6 capsules in each packet, violate § 352(a). Similarly, the labeling on these packets violates § 352(b)(2) as well. The burden on the government is merely to establish that the labeling is false or misleading in any particular, *United States v. An Article of Drug Consisting of 47 Bottles, etc.*, 200 F.Supp. 1 (D.N.J.), aff'd, 320 F.2d 564 (3rd Cir.), cert. denied, *Schere v. United States*, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963), and conscious fraud on the part of the claimant need not be established. *United States v.*

*Dotterweich*, 320 U.S. 277, 281, 64 S.Ct. 134, 88 L.Ed. 48 (1943); *United States v. Kaadt*, 171 F.2d 600, 604 (7th Cir. 1948); *United States v. An Article of Drug Consisting of 47 Bottles, etc., supra*, 200 F.Supp. at 6.

■ Moreover, under the definitions in the current United States Pharmacopoeia, the established name of a part of the substance in claimant's dihycon is phenytoin. Claimant is packaging and distributing the drug while identifying the substance as dihycon diphenylhydantoin and, accordingly, is guilty of misbranding as defined in 21 U.S.C. §§ 352(e)(1)(A) and 352(e)(2).

■ The government contends that claimant's dihycon is a new drug within the meaning of 21 U.S.C. § 321(p). Claimant contends that its product is grandfathered and can be sold and distributed without the necessity of complying with the FDA regulations and procedures with respect to new drugs. The burden is on the government to establish that a drug is a new drug. *United States v. An Article of Drug "Benetex Ulcerine," etc.*, 469 F.2d 875, 878 (5th Cir. 1972), *cert. denied*, 412 U.S. 938, 93 S.Ct. 2772, 37 L.Ed.2d 397 (1973). When the grandfather clause is relied upon, however, the claimant must prove every essential fact necessary for the invocation of that exception, and the provision is to be strictly construed. *Ibid.*

■ Only a drug which was marketed before the 1962 amendments to serve the same uses for which it is presently being sold and which was generally recognized by qualified experts at that time as safe for such uses can sustain reliance on the grandfather clause. *Tyler Pharmacal Distributors, Inc. v. HEW*, 408 F.2d 95, 99 (7th Cir. 1969). Claimant has failed in this respect. There has been uncontroverted testimony that the dihycon time release capsules were manufactured by one company (NYSCO Laboratories) from 1959 until 1972 when NYSCO went out of business. Thereafter the product was produced for claimant by another manufacturer under the NYSCO formula. There has been no evidence, however, that the uses described on the present packets are the same as those described on packets sold prior to 1962. The drug is used for treatment of grand mal epilepsy, and it can be assumed that it was sold and distributed for that purpose prior to 1962. I suppose the defendant's testimony can be read to make that point. There was, however, no testimony as to the similarity of the number and timing of doses currently prescribed and those presented on packets sold before 1962.

■ Moreover, even assuming these deficiencies in the claimant's evidentiary proof can be disregarded, there was no evidence to establish that prior to the 1962 amendments claimant's drug was generally recognized as safe for its prescribed uses. That gap is fatal. *See Tyler Pharmacal Distributors, Inc. v. HEW, supra.* The claimant has adduced the testimony of a practicing physician who testified to using the drug in her private upstate practice for 10 years or more, and whose testimony clearly indicated that she had high regard for the time release product. This testimony, however, is irrelevant, and does not meet the standard of a qualified expert referred to in the statute. *United States v. An Article of Drug "Mykocert"*, 345 F.Supp. 571 (N.D.Ill.1972); *Amp, Inc. v. Gardner*, 389 F.2d 825 (2d Cir.), *cert. denied*, 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968). To supply the expertise required by the statute one must be qualified by scientific training and experience to evaluate the safety and effectiveness of a drug. This standard is not met by a practicing physician whose knowledge is limited to the use of drugs by her patients. *United States v. 7 Cartons, More or Less, Etc.*, 293 F.Supp. 660, 664–65 (S.D.Ill.1968), *modified*, 424 F.2d 1364 (7th Cir. 1970). The critical test is not whether the product is in fact safe, but whether there is general recognition among qualified experts as to that fact. *See Amp, Inc. v. Gardner, supra*, 389 F.2d at 831.

The testimony of the government's experts of lack of published literature concerning the drug or more accurately of their unawareness of such literature, and

the failure of the claimant to produce any published body of literature predating 1962 indicating that Consolidated's dihycon was at that time generally recognized as safe, is certainly probative circumstantial evidence that no such literature existed. Absence of such literature is clearly a demonstration of the lack of general recognition. *See United States v. 41 Cases More or Less*, 420 F.2d 1126, 1130 (5th Cir. 1970).

The government experts were those most clearly qualified by training and experience to determine whether adequate or well controlled investigations had been undertaken and to evaluate those investigations to decide whether it could fairly and responsibly be concluded that the claimant's dihycon was safe and would have the effect it purports to have under the conditions for use as prescribed in the labeling. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973). They found that no controlled investigations had been undertaken and that the safety and effectiveness of the drug had not been established. While Dr. Feldmann's experience has to be taken into account, she could not be classified as an expert capable of evaluating investigations and controlled studies, nor did she purport to testify that any such investigations or controlled studies had been made or had come to her attention. Indeed, she placed her personal experience above knowledge gained from scientific investigation and indicated that even if such a showing indicated dihycon was dangerous she would continue to use it, a rather surprising and unnerving statement to come from a physician.

Based on this record it must be concluded that claimant's dihycon is a new drug since it has not been established that dihycon was generally recognized, prior to the 1962 amendments, as safe for use under the conditions prescribed among experts qualified by scientific training and experience to evaluate the drug's safety and effectiveness, nor is it presently generally recognized by such experts as safe and effective for use under the conditions prescribed in the labeling. *See Weinberger v. Hynson,*

*Westcott & Dunning, Inc., supra; United States v. An Article of Drug "Bentex Ulcerine," etc., supra.*

■ Moreover, pursuant to promulgated regulations the Secretary has declared pursuant to 21 C.F.R. § 310.3(h)(5) that the newness of a drug may arise from "[t]he newness of a dosage, or method or duration of administration or application, or other condition of use prescribed, recommended, or suggested in the labeling of such drug, even though such drug when used in other dosage, or other method or duration of administration or application, or different condition, is not a new drug." Here phenytoin in single dosage form is generally recognized as safe and effective. However, phenytoin in time release capsules is not so recognized and under this definition, claimant's drug would have to be classified as a new drug.

There is not now on file with the United States Food and Drug Administration, nor has it been shown that there ever was, an approved new drug application in respect of claimant's dihycon diphenylhydantoin or any time release phenytoin product for any purpose. Nor is there now on file, nor has there ever been, a notice of exemption for investigational use for claimant's product or for any time release phenytoin drug.

■ In sum, the court holds that all seized lots of colchicine and packets of dihycon are adulterated and misbranded because they were prepared, packaged and held under conditions not in conformity with good manufacturing practice, and the facilities and controls in their processing, packaging and holding are not operated so as to assure that the drugs meet the requirements of the act as to safety, identity, strength, quality and purity characteristics. Claimant's dihycon is a new drug which must be approved by the Food and Drug Administration before it can be marketed. *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2448, 37 L.Ed.2d 235 (1973); *CIBA Corp. v. Weinberger*, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973). Accordingly the seized lots and packets are forfeited.

IT IS SO ORDERED.