UNITED STATES of America

v.

**KASZ ENTERPRISES, INC.
and James Kaszyk.**

**Civ. A. No. 93–0455 P.**

United States District Court,
D. Rhode Island.

June 15, 1994.

---

Everett C. Sammartino, Asst. U.S. Atty., Providence, RI, Steven A. Keller, U.S. Dept. of Justice, Washington, DC, Cynthia Stofberg, U.S. Food & Drug Admin., Rockville, MD, for plaintiff.

Abraham Belilove, Arcaro, Belilove & Kolodney, Providence, RI, for defendant.

### ORDER

PETTINE, Senior District Judge.

The Report and Recommendation of United States Magistrate Judge Robert W. Lovegreen filed on May 6, 1994 in the above-captioned matter is hereby accepted pursuant to 28 U.S.C. § 636(b)(1).

SO ORDERED:

### REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Before me is the plaintiff's, United States of America ("USA"), motion for summary judgment pursuant to F.R.Civ.P. 56 seeking a permanent injunction enjoining defendants, Kasz Enterprises, Inc. and James Kaszyk (collectively "Kasz"), from manufacturing, selling and distributing a product known as Solutions 109 and any other unapproved new drugs in interstate commerce in violation of the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B). Based upon the following analysis, I recommend that USA's motion for summary judgment be granted.

### Facts

Defendant James Kaszyk is the owner and president of Kasz Enterprises, Inc. Kasz

sells and distributes two hair care products under the trade names "Solution 109 Herbal Shampoo" and "Solution 109 Herbal Cosmetic Scalp Cleanser" (collectively "Solutions 109"). USA considers Solutions 109 to be a drug under the FDCA and therefore subject to regulation by the U.S. Food and Drug Administration ("FDA"). USA contends that Solutions 109 have been and continue to be marketed by Kasz as hair growth products which are capable of stimulating hair growth on the human scalp or preventing hair loss. Products marketed for such use must receive prior FDA approval before they may be sold to the public or otherwise distributed in interstate commerce. FDA approval is obtained through a new drug application ("NDA") process which requires the applicant to establish that the drug product is safe and effective for its intended uses. Kasz has admitted in their answer that they market Solutions 109 without having sought or received FDA approval for such marketing.

Kasz states that the only claim made as to Solutions 109 is that they make hair fuller and thicker; that Kasz has never claimed that Solutions 109 can cure baldness or prevent hair loss; that Solutions 109 contains only ingredients that the FDA regards as safe for use in cosmetic formulations; that third parties have advised Kasz that Solutions 109 have promoted hair growth and prevented hair loss which information is included in promotional materials for Solutions 109; and that Solutions 109 are hair and scalp cleansers. It should be noted that Solutions 109 sell at retail for approximately $100.00.

The FDA inspected Kasz on February 12, 1991, September 9, 1992 and April 16, 1993. Each inspection resulted in a finding by the FDA that Kasz was distributing Solutions 109 in interstate commerce and promoting them for use as a hair growth and hair loss prevention system, despite numerous FDA warnings that such promotion and distribution violates the FDCA.

FDA initially inspected Kasz on February 12, 1991 and learned that Kasz was selling Solutions 109 in conjunction with advertising and promotional literature that made hair growth and hair loss prevention claims for the products. Kasz admitted that Solutions 109 were being distributed in interstate commerce. Kasz also admitted to the FDA investigator that they were responsible for developing the labeling and advertising for Solutions 109 and were responsible for marketing the products. The literature touted Solutions 109 as hair growth stimulants and hair loss preventors by incorporating opinions and testimonials supposedly obtained from third party users of Solutions 109.

These so-called "testimonials" from Kasz customers, claiming that Solutions 109 grow hair and prevent hair loss, were incorporated into a package of promotional materials that was supplied to persons inquiring about the products, to hair salons that sold the products, and to purchasers of the products. The package included a booklet entitled *KASZ Enterprises, Inc.: SOLUTION 109;* a newspaper article reprinted from the Middlesex News entitled *Is this the Solution to hair loss problem?;* and a memorandum entitled *From the Office of the President.*

The *Solutions 109* booklet contains, among other things, the testimonial that, "With Solution 109, I've stopped losing my hair and its actually growing back, even in places that were totally bald before," and the claim that, "Usually in one to three months, most customers report their hair is regrowing and their hair loss has stopped." The newspaper article reprint explains Kasz' marketing strategy of promoting Solutions 109 as hair growth and hair loss prevention products by eliciting on-the-air testimonials from radio personalities who claim that these products grow hair. The memorandum entitled *From the Office of the President* reads, in part, "Thank you for your interest in Solution 109 by KASZ Enterprises. There are many products today claiming to help people with a hair loss problem. Only KASZ Enterprise gives you: 90% client satisfaction rate [and] proven results with local celebrities...."

In addition to this promotional package, Kasz has also advertised Solutions 109 on the radio, using copy written by defendant Kaszyk that included the statement: "There's a proven effective product that people are claiming regrows their hair. It's called Solution 109 by Kasz Enterprises.

Kasz only claims to make hair fuller and thicker, the results confirm that Solution 109 far exceeds its claims."

After completing the inspection, the FDA investigator provided defendant Kasz with a copy of 21 C.F.R. § 310.527, an FDA regulation that classifies all over-the-counter ("OTC") hair growth and hair loss prevention products for external use as "new drugs" which require FDA premarket approval and explained that the distribution of Solutions 109 without such approval violated the FDCA. A few months later, on August 12, 1991, FDA sent a warning letter, explaining the violations and stating that if Kasz continued marketing Solutions 109 for hair growth and hair loss prevention, FDA might take enforcement action. In addition, the Boston District office of FDA met with defendant Kaszyk and his attorney and explained again that defendants' actions violated the law.

On September 9, 1992, FDA inspected Kasz a second time, because the FDA discovered a shipment of Solutions 109 and promotional material in Massachusetts which signalled a continuing distribution. The FDA confirmed that Kasz was still distributing Solutions 109 in interstate commerce with literature containing claims that the products grow hair and prevent hair loss. During the inspection, defendant Kaszyk again admitted that he developed the promotional material. The *Solutions 109* booklet collected during the inspection contained, among other things, claims from various media personalities stating that with use of Solutions 109 "the hair loss has stopped and my hair is growing back in those thinning areas."

FDA inspected Kasz a third time on April 16, 1993, to determine whether it was still engaged in Solutions 109 distribution. At that time, defendant Kaszyk claimed to have revised his promotional material for Solutions 109. The "new" promotional pamphlet, which is entitled *SOLUTION 109: The Herbal Aid for Thinning and Falling Hair* and bears the Kasz name and logo, was prominently displayed in Kasz' reception area. The pamphlet states, among other things, that "Kasz Enterprises was founded ... by chemist Jim Kaszyk with a goal to offer the finest drug free products for any man or woman concerned about losing hair." The pamphlet also contains the statements: "Usually in one to three months, most clients report their hair is regrowing and their hair loss has stopped," and "Many ... also see their hair regrowing in areas that were once thinning or totally bald." Included in the pamphlet is a purported testimonial from a person identified only as a "professional hairdresser" claiming that after using Solutions 109 for six months, her mother "doubled" the amount of her hair despite having previously been diagnosed by doctors as having hereditary hair loss. Defendant Kaszyk admitted that he ships the literature to purchasers who request it.

After the April 16, 1993 inspection, an FDA investigator visited one of Kasz' hair salon distributors. A sign in the salon window stated "Solutions 109 Available Here." Delia Fox, of Delia's Salon in Hanover, Massachusetts, stated that she had been told by defendant Kaszyk to display the "new" literature in her salon. She stated, as had other hair salon distributors, that the literature is provided to customers at the "point of sale," and she had the literature prominently displayed with Solutions 109 in her salon. She sold kits of Solutions 109 for over one hundred dollars apiece.

Defendant Kaszyk admits that he is aware that FDA prohibits the sale of all hair products for external use that are claimed to be effective for stimulating hair growth or preventing hair loss without prior FDA premarket approval. Defendant Kaszyk also admits that he distributes Solutions 109 in interstate commerce and does not have FDA approval to market Solutions 109. However, Kasz denies that Solutions 109 are promoted as hair growth and hair loss prevention products; that Solutions 109 are a drug as defined by the FDCA, thereby requiring FDA premarket approval; or that Solutions 109 have endangered the public health or safety.

There is no dispute as to the promotional materials accompanying Solutions 109 or that Kasz authored those materials. Likewise it is undisputed that qualified experts do not generally recognize the safety and efficacy of Solutions 109. Kasz has offered no qualified expert support for such recognition. The

dispute here involves only the interpretation of the FDCA and the conclusions to be drawn from the undisputed facts in light of that interpretation.

### Discussion

When determining a motion for summary judgment, I must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P. 56(c); *see Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.*, 980 F.2d 66, 68 (1st Cir.1992).

Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Once the moving party meets this burden, the onus falls upon the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing F.R.Civ.P. 56(e)); *see Goldman*, 985 F.2d at 1116; *Lawrence*, 980 F.2d at 68; *Garside*, 895 F.2d at 48 ("[A] 'genuine issue' exists if there is 'sufficient evidence supporting this claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" (quoting *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). To oppose the motion successfully, the nonmoving

party "may not rest upon mere allegation or denials of his pleading." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Moreover, the evidence presented by the nonmoving party "'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.'" *Mesnick*, 950 F.2d at 822 (quoting *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989)). Indeed, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Thus, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." *Goldman*, 985 F.2d at 1116 (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11).

Kasz argues there are material questions of fact which prevent the granting of summary judgment. However, where, as in the present case, there is no dispute concerning the wording and description of the labeling and other promotional materials or activities that relate to the products, the legal conclusion to be drawn therefrom can and should be resolved on summary judgment. *United States v. Articles of Drug ... 5,906 Boxes*, 745 F.2d 105, 110–11 (1st Cir.1984) (conclusion to be drawn from undisputed labeling and promotional claims concerning drug status of product should be resolved on motion for summary judgment), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1358, 84 L.Ed.2d 379 (1985).

### A. *Statutory and Regulatory Framework*

■ The definition of "drug" is set forth at 21 U.S.C. § 321(g)(1), which states, in pertinent part:

The term "drug" means ... (B) articles *intended* for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) *intended* to affect

the structure or any function of the body of man or other animals....

Whether or not a product is a drug, for purposes of the FDCA, therefore depends not on the physical properties of the product or what effect the product has on humans but rather on the *intended* uses or effects of the product.

In establishing the intended use of a substance for purposes of the FDCA, it is the vendor's intent, as determined or inferred from labeling, promotional material, advertising, or any other relevant source, which controls, and not the actual physical effect on the human body. *United States v. Storage Spaces Designated Nos. 8 and 49*, 777 F.2d 1363, 1366 (9th Cir.1985), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1987); *National Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 333–34 (2d Cir.1977); *United States v. An Article ... Consisting of 216 Cartoned Bottles, More or Less ... Sudden Change*, 409 F.2d 734, 739 (2d Cir.1969). A cosmetic, such as shampoo, can be a drug, regardless of its actual physical effects, if its intended uses bring it within the FDCA's drug definition. *See e.g., Sudden Change*, 409 F.2d at 739. As the court in *Sudden Change* noted, "Congress has made a judgment that a product is subject to regulation as a drug if certain promotional claims are made for it." 409 F.2d at 739.

The FDCA imposes various requirements upon persons wishing to market a drug, one of which is directly pertinent to this case. It requires that all new drugs be approved by the FDA before they can be distributed in interstate commerce. 21 U.S.C. § 355(a). A "new drug" is defined in the FDCA as one which is not generally recognized by experts in the field as safe and effective for use under the conditions indicated or suggested in its labeling[1] or one which has been so recognized but which has not been used to a material extent or for a material time under such conditions. 21 U.S.C. § 321(p). In order to get FDA approval for the marketing and distribution of a new drug, the manufac-

turer or distributor must establish that the drug is in fact safe and effective. *See* 21 U.S.C. § 355(b). In other words, unless a drug is generally recognized as safe and effective, and has been used for a material extent and time, the burden is on the manufacturer or distributor to prove safety and effectiveness. *Id.*

Failure to comply with the new drug approval requirement will subject the responsible party to enforcement action by FDA under the FDCA. The distribution in interstate commerce of an unapproved new drug, or the causing thereof, is prohibited. 21 U.S.C. § 331(d). The FDCA specifically authorizes the government to seek injunctions in federal district court to enjoin such violations. 21 U.S.C. § 332(a).

### B. *Solutions 109 are Drugs Under the FDCA*

■ The threshold question in this analysis is whether Solutions 109 are drugs which would thus subject them to regulation by FDA under the FDCA. If a product is *intended* for use in the treatment of disease or is *intended* to affect the structure or function of the human body, it is a drug under the FDCA. 21 U.S.C. § 321(g).

The intended use of a product is determined by the vendor's *objective* intent in promoting, distributing, and selling the product. *See* 21 C.F.R. § 201.128; *Sudden Change*, 409 F.2d at 739. Objective intent can be demonstrated by, among other things, "labeling" claims, advertising material, oral and written statements, and evidence that the vendor is aware that his product is being offered or used by others for a purpose for which it is neither labeled nor advertised. 21 C.F.R. § 201.128. For example, claims in circulars and newspaper advertisements that explain the curative properties of products may establish that such products are drugs. *See V.E. Irons, Inc. v. United States*, 244 F.2d 34, 39–45 (1st Cir.1957). Similarly, testimonials regarding a product's curative

---

**1.** The term "labeling" has a somewhat expansive definition in the FDCA, and refers not only to labels but also to "other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying

such articles". 21 U.S.C. § 321(m). The written, printed, or graphic matter does not have to accompany the articles or drug in question physically. *United States v. Urbuteit*, 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61 (1948).

properties or ability to affect the structure or function of the human body may be used to establish the intended use of the article as a drug. *United States v. Millpax, Inc.,* 313 F.2d 152, 154 (7th Cir.), *cert. denied,* 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 198 (1963).

Solutions 109 are drugs within the meaning of 21 U.S.C. § 321(g)(1)(B). Products intended for use in the treatment, prevention, or cure of baldness or thinning hair, are drugs within the meaning of Section 321(g)(1)(B), because hair loss can be a manifestation of disease. For example, malnutrition, exposure to radiation, and hormonal imbalance can cause generalized hair loss. Fungus infection, secondary syphilis, and lupus erythematosus can cause patchy or extreme baldness. In addition, alopecia areata, an inflammatory loss of hair in sharply defined areas, causes hair loss. *See* "Hair Grower and Hair Loss Prevention" Drug Products for Over–the–Counter Use, Proposed Rule ("Hair Grower Proposal"), 45 Fed.Reg. 73,955, 73,958 (November 7, 1980). It is clear that Kasz has marketed Solutions 109 as hair growth stimulation and hair loss prevention products notwithstanding Kasz' disclaimer that Solutions 109 only make hair look fuller and thicker. The promotional materials accompanying Solutions 109 are replete with claims (testimonials) that hair growth has occurred and hair loss prevented with use of these products. Therefore, Solutions 109 are intended by Kasz for use in the mitigation, treatment or prevention of hair loss and are thus drugs within the meaning of 21 U.S.C. § 321(g)(1)(B).

Solutions 109 are also drugs within the meaning of 21 U.S.C. § 321(g)(1)(C), because they are represented to have a physiological effect on the body of man, namely, to cause hair growth and to prevent hair loss. The hair growth process is a function of the human body. Hair follicles grow cyclically, over a certain length of time; various diseases or male pattern baldness can alter this pattern of growth. Products that claim to be effective for growing hair or preventing hair loss, thus claim to alter the functioning of the hair growth and hair loss process. Likewise, such products are intended to alter the structure of the hair itself, to make it grow longer or thicker, or to prevent the hair from becoming thinner. *See* Hair Grower Proposal, 45 Fed.Reg. at 73,957; *see also Sudden Change,* 409 F.2d at 741–42 (skin lotion making claims to alter the structure and function of the skin by referring to "face lifts" and "surgery" was a drug); *United States v. 250 Jars ... U.S. Fancy Pure Honey,* 218 F.Supp. 208 (E.D.Mich.1963), *aff'd,* 344 F.2d 288 (6th Cir.1965) (finding product claimed effective for "increas[ing] your vitality," was intended to affect a function of the body and was therefore a drug).[2]

The government's position is that it need show only one of the statutory definitions of "drug" within 21 U.S.C. § 321(g)(1) and it need not show that a product be intended to both treat disease *and* to affect the structure or function of the body. Kasz disagrees and argues that it is the burden of the USA to establish *both* intents before it is entitled to summary judgment.

The statutory definition does not require that a product be intended both to treat disease *and* to affect the structure or function of the body; these are two different ways in which a product may be considered a drug under the FDCA. *See United States v. An Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 793–95, 89 S.Ct. 1410, 1415–17, 22 L.Ed.2d 726 (explaining congressional history and intent of amendment adding "affecting structure or function of body" definition as creating additional category of products considered "drug" under FDCA), *reh. denied,* 395 U.S. 954, 89 S.Ct. 2013, 23 L.Ed.2d 473 (1969); *see also Nutrilab v. Schweiker,* 713 F.2d 335, 336 (7th Cir.1983).

---

**2.** That Solutions 109 are ostensibly shampoo is irrelevant. A broad variety of articles have been held to be drugs based on the claims made for them. *See e.g., United States v. Hohensee,* 243 F.2d 367, 370 (3rd Cir.), *cert. denied,* 353 U.S. 976, 77 S.Ct. 1058, 1 L.Ed.2d 1136 (1957) (peppermint tea leaves); *Bradley v. United States,* 264 F. 79, 81–82 (5th Cir.1920) (mineral water); *Nu-*

*trilab, Inc. v. Schweiker,* 547 F.Supp. 880, 883 (N.D.Ill.1982) (kidney bean flour), *aff'd,* 713 F.2d 335 (7th Cir.1983); *United States v. 250 Jars ... U.S. Fancy Pure Honey,* 218 F.Supp. at 211 (honey), *aff'd,* 344 F.2d 288 (6th Cir.1965); *United States v. 354 Bulk Cartons ... Trim Reducing–Aid Cigarettes,* 178 F.Supp. 847, 851 (D.N.J.1959) (cigarettes).

The USA is correct in its contention that it must show that Solutions 109 are intended *either* to treat a disease *or* to affect the structure or function of the body, and as stated above, it has met this burden.

### C. Solutions 109 May Not Be Distributed in Interstate Commerce Without Prior FDA Approval.

■ Any drug which is classified as a "new drug" under the FDCA may not be distributed in interstate commerce without prior FDA approval. 21 U.S.C. § 355(a). A "new drug" is defined as:

> Any drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof....

21 U.S.C. § 321(p). Thus, every drug is considered a "new drug" unless it is generally recognized by qualified experts as safe and effective ("GRASE") for its labeled uses.[3] The exclusion of GRASE drugs from the comprehensive premarket approval system is a narrow exclusion and applies to a very small segment of the drug market.[4]

Over-the-counter (OTC) drug products that are offered for use as hair growers or for hair loss prevention have been determined to be not generally recognized as safe and effective for their intended uses. 21 C.F.R. § 310.527(a). As such, any OTC drug product that is labeled, represented, or promoted for external use as a hair grower or for hair loss prevention is regarded as a new drug within the meaning of the FDCA, and may not be distributed without prior FDA approval. 21 C.F.R. § 310.527(b).[5] In other words, all OTC hair growth and hair loss prevention products must be established by the proponent to be safe and effective for such use, in the form of an approved new drug application, before they can be marketed. *Id.; See* 21 U.S.C. § 355. Products for which hair growth claims are made are drug products subject to FDA regulation. *See, e.g., United States v. Belden,* 714 F.Supp. 42, 43–44 (N.D.N.Y.1987).

Solutions 109 are labeled, represented or promoted for external use as hair growth facilitators and/or for hair loss prevention. They therefore fall within the hair growth product regulation, 21 C.F.R. § 310.527, and are new drugs requiring FDA approval prior to distribution. The promotional materials that are distributed by Kasz in connection with the sale of Solutions 109 are considered to be "labeling" under the FDCA, insofar as the definition of labeling is not limited to the traditional concept of "label on the container". *See* 21 U.S.C. § 321(m).[6]

---

3. Drugs not meeting the GRASE requirement that were legally on the market prior to June 30, 1906 are "grandfathered" and are not considered "new drugs." 21 U.S.C. § 321(p)(1).

4. For instance, even if a drug is determined to be GRASE, the drug must also have been used to a material extent or for a material time in order to be exempt from "new drug" status. 21 U.S.C. § 321(p)(2).

5. 21 C.F.R. § 310.527 was published in final form on July 7, 1989, and became effective as to any new drug introduced or delivered for introduction into interstate commerce after January 8, 1990. FDA issued this final rule after thorough review of the reports and recommendations of the OTC Miscellaneous External Drug Product Advisory Committee, and comments received from two public comment periods on the proposed monograph declaring that all hair growth and hair loss prevention products for external use are "new drugs," requiring FDA premarket approval. *See* 45 Fed.Reg. 73,955 (Nov. 7,

1980); 50 Fed.Reg. 2,190 (January 15, 1985); 54 Fed.Reg. 28,772 (July 7, 1989). The regulation was issued because FDA determined that there existed absolutely no scientific evidence of the effectiveness of *any* ingredients or products for OTC external use for the purpose of growing hair or preventing hair loss on which experts in the field could come to a consensus that the products are safe and effective. *See* Hair Grower Final Rule, 54 Fed.Reg. 28,772.

6. "Labeling" is defined in 21 U.S.C. § 321(m) as "all labels and other written, printed, or graphic matter" on the article or *accompanying* the article. *Any* printed material, including books and pamphlets, which refers to or explains the usefulness of a product and which is used, in any way, in its sale "accompanies" the article in the statutory sense and constitutes "labeling." *See e.g., Kordel v. United States,* 335 U.S. 345, 350, 69 S.Ct. 106, 109–10, 93 L.Ed. 52 (1948). "One article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies

Kasz readily admits that they do not hold an approved new drug application for Solutions 109. Therefore, as unapproved new drugs, the products are prohibited from interstate commerce. 21 U.S.C. §§ 331(d), 355(a); 21 C.F.R. § 310.527. Despite this prohibition, the defendants have been distributing Solutions 109 in interstate commerce from Rhode Island, and continue to do so. Kasz' own records establish that sales and distribution of Solutions 109 are made to customers in Massachusetts, California, Florida, Connecticut and New York.

### D. *Labelling and Promotional Materials*

■ It is certainly true that many of the hair growth claims contained in the labeling and promotional materials for Solutions 109 appear to come from third parties, usually in the form of testimonials claiming that Solutions 109 produced hair growth. Such third party testimonials are, however, every bit as much hair growth claims made for Solutions 109 by Kasz as would be claims made by Kasz directly. The sellers of a product, by including in their labeling and promotional literature third party claims and testimonials concerning the product, "endorse, and thereby adopt as their own, the statements and representations of others." *United States v. Sene X Eleemosynary Corp.*, 479 F.Supp. 970, 980 (S.D.Fla.1979); *United States v. Vital Health Products, Ltd.*, 786 F.Supp. 761, 776 (E.D.Wis.1992), *aff'd*, 985 F.2d 563 (7th Cir.1993). *See also United States v. Millpax, Inc.*, 313 F.2d 152, 154 (7th Cir.) (product is a "drug" where, despite disclaimer, drug claims made by third parties were adopted by sellers as their own through reference in letter accompanying product), *cert. denied*, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 198 (1963).

Furthermore, many of the drug claims contained in the Solutions 109 literature are from Kasz and not from third parties. For example, the revised promotional pamphlet collected from Kasz during the April, 1993 inspection states that the goal of Kasz Enterprises is "to offer the finest drug free products *for any man or woman concerned about losing hair.*" (emphasis added). The title of this pamphlet claims that Solutions 109 is the "herbal aid for thinning and falling hair." Kasz' radio copy claims that Solution 109 is "a proven effective product that people are claiming regrows their hair." (emphasis added). The literature titled "From the Office of the President" claims that although "[t]here are many products today claiming to help people with a hair loss problem", only Kasz' products have a "90% client satisfaction rate...."

■ Kasz also points out that certain disclaimer language is contained in some of their promotional material. There is no dispute as to this fact. The USA agrees that language purporting to disclaim the drug status of Solutions 109 is contained in some of Kasz's labeling and promotional material. The existence of these disclaimers does nothing to undermine the equally undisputed fact that Kasz' labeling and promotional materials for Solutions 109 contain claims that these products are effective in stimulating hair growth.

Disclaimers relating to intended drug uses are ineffective where the overall circumstances demonstrate the seller's true intent to communicate to the consumer that a product has drug uses. It is the *objective* intent of the vendor, not the vendor's subjective explanations and disclaimers, which determines the intended use of a product, as gleaned not only from the vendor's statements, but from any relevant source, such as promotional material, advertising, labeling and other circumstances surrounding the distribution of the article. *Sudden Change*, 409 F.2d at 739–40; 21 C.F.R. § 201.128. In

a bill." *Id.; V.E. Irons*, 244 F.2d at 39. As such, the promotional material need not be affixed to the product or even shipped with the product to constitute labeling under the FDCA. *See Kordel*, 335, U.S. at 350, 69 S.Ct. at 109–110; *see also United States v. Urbuteit*, 335 U.S. 355, 357–58, 69 S.Ct. 112, 113–14, 93 L.Ed. 61 (1948). Newspaper articles may be located in a different part of a store and booklets may be sold separately from the product, and still constitute labeling. *See 250 Jars ... U.S. Fancy Pure Honey*, 218 F.Supp. at 211. In fact, written material *intended* for the purpose of promoting a product, but never distributed, is considered "labeling." *See United States v. An Article of Drug ... 47 Bottles, more or less, etc.*, 320 F.2d 564, 567–69 (3rd Cir.), *cert. denied*, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963).

*United States v. Storage Spaces Designated Nos. 8 and 49,* 777 F.2d 1363, 1366, n. 5 (9th Cir.1985), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 148 (1986), the Ninth Circuit ruled that products which had been promoted in a manner suggesting that they were synthetic cocaine substitutes were drugs despite labeling stating that the products were "incense" and were "not for drug use". Similarly, in *Millpax,* the Seventh Circuit stated that a disclaimer from the manufacturer of a product touted as a cancer cure, which stated that "no claim is made that the product cures anything, either by the writer or the manufacturer", was ineffective in preventing the product from being classified as a drug, where the overall circumstances established that the manufacturer intended its sale for use as a cancer cure. 313 F.2d at 154. *See also National Nutritional Foods Ass'n v. Mathews,* 557 F.2d 325, 334 (2d Cir.1977) (FDA not bound by manufacturer's subjective claims of intent but can find true intent use based on objective evidence). As one court put it:

> Where a person has set in motion forces that result in creating an impression that an article has value in the treatment of disease, he cannot avoid the legal consequences of such action by a disclaimer in the labeling asserting there is no scientific evidence that the article has therapeutic value.

*United States v. 3 Cartons, Etc.,* 132 F.Supp. 569, 574 (S.D.Cal.1952).

It is apparent from even a cursory review of Kasz's labeling and promotional material for Solutions 109 that, despite their attempts to circumvent the requirements of the FDCA by avoiding direct hair growth claims and by inserting disclaimer language in the literature, they in fact promote Solutions 109 for hair growth purposes and intend to convey to the consumer the notion that use of these products can stimulate hair growth or stop hair loss. The intent and effect of the FDCA in protecting consumers from drug claims that have not been supported by competent scientific proof cannot be circumvented by linguistic game-playing. If Kasz really did not intend for consumers to purchase their products in the belief that the products

would grow hair, Kasz would simply have removed all references to hair growth in their labeling and promotional literature. They have not done so, doubtless because they know that consumers will not purchase normal shampoo for the $100 price now being charged for Solutions 109 unless they believe that it will grow hair.

### E. Granting of Injunctive Relief

■ The FDCA, 21 U.S.C. § 332(a), expressly grants federal district courts jurisdiction to enjoin violations of 21 U.S.C. § 331. This injunctive power should be exercised in light of the FDCA's purpose to protect the public health. *United States v. An Article of Drug ... Bacto–Unidisk,* 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726, *reh'g denied,* 395 U.S. 954, 89 S.Ct. 2013, 23 L.Ed.2d 473 (1969).

Kasz argues that the USA must also establish that Solutions 109 adversely effect the public health and safety, but there is no support for this position. They contend that there are no known consumer complaints, and the USA is being overly aggressive.

The purpose of the FDCA is to protect the public health. *United States v. An Article of Drug ... Bacto–Unidisk,* 394 U.S. at 798, 89 S.Ct. at 1418; *Sudden Change,* 409 F.2d at 740. A violation of the FDCA is *presumed* to harm the public. *United States v. Diapulse Corp. of America,* 457 F.2d 25, 28 (2d Cir. 1972). It is settled that where a statute designed to protect the public authorizes an injunction, considerations applicable to private actions such as irreparable injury and a balancing of the equities are not relevant. *See Hecht Co. v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 803 (3d Cir.1989); *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 175 (9th Cir.1987); *United States v. Barr Laboratories, Inc.,* 812 F.Supp. 458, 485 (D.N.J.1993). In particular, when seeking a preliminary injunction, the government need not show that irreparable injury will result in the absence of injunctive relief; such injury is to be presumed. *Government of the Virgin Islands v. V.I. Paving, Inc.,* 714 F.2d 283, 286 (3rd Cir.1983); *Odessa Union,* 833 F.2d at 175. This is especially

true in a suit alleging violations of the FDCA. *See United States v. Diapulse Corp. of Am.,* 457 F.2d 25, 28 (2d Cir.1972) ("The passage of the [FDC Act] is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained.")

The requirements for statutory injunctive relief are met when, as here, "the government establishes that the defendants have violated the statute and there exists some cognizable danger of recurrent violations." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Moreover, a district court can infer that future violations are likely to occur based on the defendant's past unlawful conduct. *See Odessa Union,* 833 F.2d at 176; *Commodity Futures Trading Comm'n v. American Bd. of Trade, Inc.,* 803 F.2d 1242, 1251 (2d Cir.1986).

Injunctive relief is particularly appropriate in cases such as this where violations are systematic and ongoing, notwithstanding repeated warnings by FDA. *See United States v. Lit Drug Co.,* 333 F.Supp. 990, 999 (D.N.J. 1971). As the *Lit Drug Co.* court stated about defendants who had engaged in good manufacturing practice violations for five years: "The law is also clear that a court must effectively safeguard the public interest against the abuses inflicted by a willful, persistent violator of regulatory legislation who has not shown good faith in compliance." 333 F.Supp. at 999. *See Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.) ("When the violation has been founded on systemic wrongdoing rather than an isolated occurrence, a court should be more willing to enjoin future misconduct. And when a defendant, because of his professional occupation or career interest, will be in a position in which future violation could be possible, [injunctive] relief is appropriate."), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979).

In short, injunctive relief is fully warranted upon a showing that the defendants have violated the law, and that they may continue to do so. This burden has been met in the present case. The government has established that Kasz have violated the FDCA by introducing unapproved new drugs into interstate commerce. The government has also established that Kasz have a long and unwavering history of flagrant disregard for the law and resistance to FDA regulation. They have continued to unlawfully distribute Solutions 109, despite FDA's attempts to obtain voluntary compliance, for three years since FDA first became aware of their distribution. Even though Kasz have modified the Solutions 109 promotional materials, the current materials still aggressively imply that the products promote hair growth and hair loss prevention. It is also apparent that the defendants intend to continue to distribute Solutions 109. Therefore, an injunction, pursuant to 21 U.S.C. § 332(a), should issue. *See W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 897–98; *United States v. Dianovin Pharmaceutical, Inc.,* 475 F.2d 100, 103 (1st Cir. 1973); *Diapulse,* 457 F.2d at 28–29.

### *Conclusion*

For the aforesaid reasons, I recommend that the USA's motion for summary judgment be granted to the extent that a permanent injunction issue in favor of the USA enjoining both defendants (Kasz) from manufacturing, selling and distributing Solutions 109 in interstate commerce in violation of the FDCA.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[7] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[8]

May 6, 1994

---

7. Rule 32, Local Rules of Court; F.R.Civ.P. 72(b).

8. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).